Andrews, J.
The relator entered into a contract with the State, on the 15th day of Eovember, 1869, for making certain extraordinary improvements in the Erie canal, at and in the vicinity of the city of Rochester, at prices for different kinds of work specified in the contract, one clause of which, was: “For removing ice and snow, and for pumping, bailing and draining, including the expense of removing and constructing coffer-dams, excavating ditches and all other items of cost, caused by pumping, bailing and draining, the sum of $3,500.” On the 9th of May, 1870, after this part of the work had been substantially performed, the legislature, by a provision in a public act, required the canal commissioners to change this sum to $13,500, thereby adding $10,000 to the sum named in the contract. In the final estimate of .the engineer this sum was included, and the canal commissioner gave a draft upon the auditor for the balance due. The latter officer, upon the advice of the attorney-general, refused to pay the draft, upon the ground that the act giving the additional compensation was unconstitutional and void.
The provision of the Constitution which it is claimed is violated by this act of the legislature, is a clause contained in the amendment adopted in 1854, providing for borrowing money and completing the enlargement of certain canals in the State, which is as follows: “All contracts for work or *373 materials on any canal shall he made with the person who shall offer to do or provide the same at the lowest price, with adequate security for their performance.” The ground is taken, that this provision not only requires the contracts to be let to the lowest bidder, but by necessary implication requires that the work shall be done and paid for at the prices named in such bids, and that it is not competent for the legislature, either during the progress of such work or after its completion, to increase the prices or in any form to allow to the contractors additional or extra compensation for doing the work.
We have carefully examined the question and considered the elaborate argument of the attorney-general, as well as the views contained in the opinions of the learned judges at Special and General Terms, and we are satisfied that the views urged on behalf of the defendant proceed upon a misapprehension of the true object and purpose, and a misconstruction of the language of this constitutional clause. In the first place, the language is clear and explicit and relates solely to the subject of awarding contracts upon competitive bidding, and requires such contracts to be made with the lowest bidder. It does not profess to deal with the contracts after they are made, nor to restrain or interfere with the power of the legislature over them. Beyond requiring that contracts shall be made with the lowest bidder, and that adequate security shall be taken for their performance, there is nothing in the clause indicating a purpose to deprive the legislature of any power which it had previously exercised or then possessed over the subject. To interpolate the words that, in addition to making contracts with the lowest bidder, the work shall be done and paid for at those prices only, would be unwarrantable upon any principle of construction. This clause secures to the State a contract at the lowest prices bid, with security for its performance and the power of enforcing it against the contractor and the sureties; but whether it will do so, or whether, upon considera-' tions of public policy, or of equity or of interest, it will *374 modify it or make further allowances, by way of increasing prices or otherwise, is a power which has always resided in the legislature, and which the clause in question was not designed to, and, in its language, does not interfere with. The clause does not require all work to be let by contract, but only that all contracts by bidding shall be made with the lowest bidder; and the attorney-general conceded, upon the argument, that it was competent for the legislature to authorize the performance of all work, whether of construction or repairs, without contract, and through its own officers and agents, and that, when so done, such officers and agents might purchase materials and hire labor by contract or otherwise without violating this provision of the Constitution. This may be the most expensive way of performing public work, and is quite as liable as any other to lead to fraud and peculation; and the fact that the legislature is not restrained from doing the work in this manner furnishes a strong inference that the clause in question was not intended to prescribe the mode of doing work, nor beyond the security which the contracts afford, if public lettings are adopted to limit the actual cost of the work. Ho constitutional provision can prevent a failure, on the part of the contractor, to perform his contract nor his abandonment of it; and it is conceded that the legislature may cancel or authorize contracts to be canceled. This concession yields the whole argument. If, as is claimed, the provision requiring a contract to be made with the lowest bidder prevents the legislature, with the consent of the contractor, from modifying its terms as to price, or from making any additional allowance for work done, it is because its provisions become fixed by constitutional mandate, and, if so, it cannot be abrogated, nor those bound by its provisions released or discharged. The power to cancel and destroy is greater than the power to change and alter; and where the former is conceded, the latter must exist also upon the principle that the less is included in the greater. Where the language of a Constitution is plain there is no occasion for construction, and *375 there is no possible meaning to be given to the words of this clause which extend beyond what they import, viz., the mode of awarding and making contracts at public lettings.
But, aside from this consideration, a reference to the circumstances existing at the time of its adoption shows clearly that it was intended to be confined to this subject only. It is elementary that “ the best and surest mode of expounding an instrument is by referring to the time when and circumstances under which it was made.” (Smith’s Const. Com., § 512.) Prior to this amendment, contracts for public work had always been made by a contracting board composed generally of the canal commissioners. The lowest bidder principle had never been adopted and adhered to in letting contracts. Besides price, other considerations, such as the capacity and responsibility of those offering to perform the work, were regarded, and contracts were awarded upon" such bids and to such persons as were deemed most advantageous to the State. This practice necessarily invested the contracting'board with a considerable discretion in awarding contracts, and gave the opportunity to indulge in personal or political favoritism; and yet so well and honestly had this duty been performed, that the Erie and Champlain canals and all the lateral canals were constructed, and the enlargement of the Erie and other canals commenced without any change in the law or practice on the subject. In 1851, the so-called "nine millions bill ” was passed, which provided for borrowing $9,000,000 for the immediate completion of the enlargement of the Erie and other canals specified in the act. The act also provided that contracts were to be executed on the part of the State by the canal commissioners, state engineer and division engineer, upon each division, and gave certain supervisory power as to terms and manner to the canal board. Under this act, the whole work was advertised, and a single letting held in the city of Albany, which attracted the attention of the people throughout the State, and resulted in wide-spread dissatisfaction. The propriety of adopting the lowest bidder principle was extensively discussed, and a distinct proposition *376 to that effect was defeated in the canal board. After a long and exciting contest, the contracts were finally awarded by the contracting board in disregard of that principle. Upon the assembling of the legislature of 1852, a joint committee . of both houses was appointed to investigate the action of the officers connected with the letting. A majority of the committee reported in favor of sustaining the award of contracts which had been made. The notoriety and exciting character of this letting may be inferred from a single paragraph of the report: “From all parts of the State; from other States; from all walks of life; from every profession, pursuit and trade; from every division and subdivision of political sects, there swarmed upon the capítol a legion of applicants, all anxious and importunate for a participation in the anticipated profits of some share in this improvement, the last for many years, at least, to be obtained upon the public works of the State. The expectations of all ran high.” The committee state, that for the 300 contracts to be let, there were 3,000 bidders, and in taking evidence they inquired as to the reason for and against the lowest bidder principle. The act was declared unconstitutional and void by the Court of Appeals, during that year, and the contracts fell with it. From these historical facts, it is apparent that the whole subject of letting contracts was prominently before the public, and that the discretionary power theretofore exercised by the letting board, in awarding contracts, was the subject of public discussion and criticism, caused by the unprecedented letting of 1851, and the manner in which the contracts were permitted by the law to be and were, in fact, awarded. With this subject fresh in the public mind, the legislature of 1853 entered upon the task of proposing a constitutional amendment to secure the enlargement; and it is proper to refer to the proceedings of that body when the clause in question was incorporated in the amendment. This clause was inserted by the Senate, April sixth, on the motion of Mr. Taber, and was at 'first adopted with express provisions prohibiting the releasing of contracts and the awarding of extra compensa *377 tion. Upon the same day, Mr. Vanderbilt, who had introduced the resolution to amend the Constitution, moved to strike out the amendment of Mr. Taber, when Mr. Cooley moved to modify the motion by striking out the words “ which im, no event shall be released,” and the words “ and no extra compensation shall, on a/ny accownt, be allowed to any such contractor.” In advocating the amendment, the mover insisted that the provision requiring contracts to be made with the lowest bidder should be retained, while the subject of releasing the contractors and allowing extra compensation should be left to the judgment of the legislature. The amendment was adopted, and we are to presume upon an acquiescence in these views. There was a slight alteration afterward made, but not essentially changing it. These proceedings indicate that the precise question involved was considered by the senate in proposing the amendment, and upon such consideration it was determined to confine the clause to awarding and making contracts, and to leave the power over the subject of further allowances where it had always been— with the legislature; and they show also that the legislature understood the import of the language used. The business upon which the State was about to enter was not new. It had been engaged in constructing, repairing and managing canals since 1818, and the people, in ratifying the amendment, are presumed to have done so with an intelligent understanding of the terms employed.
Every year, from 1853 to the present time, the legislature has passed acts of a character similar to the one in question, which have received the approval of the executive, and been acted upon by State officers without challenge, so that for nearly twenty years, through all the changes of public officers, a practical construction has been given to the clause in question in accordance with the views here indicated. We refer to a few of the many acts granting extra compensation, etc., for the purpose of showing the uniform practice of the legislature on this subject: Laws of 1855, chapter 418; 1856, chapter 193; 1857, chapter 343; 1858, chapter 252; 1859, *378 chapter 300; 1860, chapter 520; 1861, chapter 271; 1862, chapter 164; 1863, chapter 394; 1864, chapter 252; 1865, chapter 500; 1866, chapter 902; 1867, chapter 900; 1868, chapter 494; 1869, chapter 783; 1870, chapter 580; 1871, chapter 586.
The practical construction of the clause in question 'by the legislature, commencing with the adoption of the amendment of 1853 and continued to the present time, which has been acquiesced in and acted upon by the executive and administrative departments of the government, and which, so far as we know, has never before been questioned, is entitled to great, and we think controlling, weight in its interpretation. It has almost the force of a judicial exposition (Story on Const., § 408), and, unless such legislation and practice is manifestly in violation of the words used, the greatest weight should be given to it in construing them. (Cooley Const. Lim., 67, and cases cited.)
The clause is as binding upon the legislature as upon other departments of government; but binding only upon the subject upon which it treats, the awarding and making of contracts, and not upon the other subject of managing and modifying the contracts, or making further allowances as the exigencies of the case may require. The two things are entirely different and distinct, and the power to deal with them has always been vested in different officers and bodies. The legislature has always retained the power over the latter, except that prior to 1849 it was conferred, to a limited extent, upon the canal board, while the former has always been exercised by a subordinate board or officers. We have, then, 1. The language carefully restricted to awarding and making contracts. 2. A practice of awarding contracts in disregard of the lowest bidder principle, which was felt to be an evil by the result of an extensive and exciting public letting just prior to the adoption of the amendment, which evil was aimed at by words apt and fitting for that' purpose, but inappropriate and insufficient to restrict the power of the legislature in any other respect. 3. The expressed intention *379 of the legislature which proposed the amendment to confine it to the subject of awarding contracts. 4. The uniform action of the legislature and of the executive department of the government, since its adoption, in accordance with and corroborative of the same construction. With these elements in favor bf a particular construction of the Constitution, it would be unprecedented for any court to change it.
It does not aid the argument on-behalf of the defendant, if it is conceded that the clause ought to be as it is claimed to be. The language of a Constitution cannot be extended beyond the scope of its terms because the enlarged construction would be desirable or convenient. (49 N. Y., 280.) It was deemed safe, in 1853, to leave the power with the legislature. If evils have since been developed requiring further restriction, it must be done by other than judicial authority. It is said that if the legislature may increase the prices, the design of the provision, that contracts shall be awarded to the lowest bidder, is defeated. This is a mistake. The argument is founded upon the erroneous idea that the awarding of contracts operates beyond the act and upon the management afterward. As we have seen, the clause was aimed mainly at the evil of favoritism in giving out contracts. It is urged that this object is too insignificant to warrant the supposition that the people would have amended the Constitution to accomplish it. The clause in question was regarded as subordinate in importance to the main purpose of the amendment, and, beyond the legislature, probably received no special attention. The amendment would, probably, have been adopted, with this clause in or out. But it is unsafe to pass judgment upon the importance of a particular amendment, from a stand-point twenty years distant, and after the occurrences which gave rise to it have faded from memory, and a whole generation has passed away. It was then deemed of great importance to remedy the evil of awarding contracts to personal and political favorites, and to prevent its continuance in constructing the great work for which the amendment provided. A want of present necessity for the restric *380 tion, if it existed, would not change the construction; but in a State with such extensive public works, the rule prescribed cannot be said to be either improper or unnecessary.
It is also urged ■ that the legislature may do wrong, and many cases are supposed in which that body might exercise the power of increasing prices or making extra allowances, to the great injury of the State. This argument proves too much. If a wrong exercise of power proves a want of power, it may be that the legislature would he stripped of all power. It must he borne in mind that all legislative power has been granted by the Constitution to the Senate and Assembly, and their acts are to be held valid unless restrained by some provision of the instrument. Courts cannot deny the power because it has been or may be improperly used. The legislature possesses almost unlimited power of taxation, and it may appropriate public money for improper purposes, or give it away by the requisite vote ; yet we cannot deny the power, however unwisely used. The duty of courts ends with determining the question of power. The clause in question was aimed at a particular evil, and has accomplished and continues to accomplish its object; but it does not restrict or relate to the power exercised by the legislature in passing the act in question for the relief of the relator.
There is another ground upon which the action of the legislature may be sustained, and that is upon its conceded power to discharge legal or equitable obligations of the State, and we agree with Parker, J., in his dissenting opinion at the General Term, that the exercise of this power is not reviewable by the courts. We are bound to presume that sufficient grounds existed, if they could in any case exist. It is not necessary to specify the grounds in the act, or to prove them in court. It bélongs to those who allege the invalidity of an act of the legislature to show it affirmatively. The want of power qfflyd appear. Every presumption is in favor of the validity oifan act of the legislature. We cannot know whether the relator had an equitable or legal claim against the State for this allowance or not. There may have *381 been a material mistake of facts in entering into the contract, or some mistake or misrepresentation in regard to the work, or some unforeseen occurrence upon which a claim might be predicated. Nor is the legislature restricted, in granting relief, to such grounds as would be requisite to maintain an action against an individual in courts of justice. Many other considerations may and often should be considered in the dealings of a State with its citizens. (13 N. Y., 149 ; 4 id., 412.)
It is unnecessary to consider whether this allowance could be sustained as a gift or donation. The legislature possesses the power to donate public funds to private use, but it requires a two-third vote; and as we think the act valid upon other grounds, we refrain from considering this question.
There was also an objection to an item of about $1,600, contained in the final estimate for extra work, in consequence of a change of plan by the canal board. It is urged that, as there were no prices specified in the contract for the kind of work required by the change of plan, it was, in fact, done by a contract outside of the contract for the principal work.
By the principal contract the relator agreed “ to perform all the work contracted for, as specified in this contract; but any change in the form, dimensions, location or manner of doing the work, ordered by the canal commissioners and division engineer, in accordance with section 9 of chapter 377 of Laws of 1850, shall be made as directed; ” and then provides that if the quantities are increased or diminished by such alteration, the contractor shall do the same at the rates specified in the contract, without making any claim for damages in consequence thereof. The statute referred to (chapter 377 of the Laws of 1850) requires that, before any alteration is made in work under contract which shall increase the expense, a statement in writing shall be submitted to the canal board, setting forth the objects to be attained and the expense thereof; and the consent of the board shall be obtained. These formalities were complied with, and the canal board consented to the change. If the rates for the changed work are fixed *382 in the contract, they are to govern; if not (as is claimed in this case), then what ? As the contractor had agreed to do the work as directed, and there was no price fixed in the contract, one of two things must follow—either the contractor was entitled to pay, as upon a quantum meruit, or. he was hound to do it at such prices as the State might determine. In either case the doing of the work was a contingency provided for in the contract. But if not, it must be regarded as work don.e by the State. The engineer and canal board fixed the prices, and, if not provided for in the contract, they might have employed any other person besides the contractor to do it. Nothing appears in the papers showing that any outside contract was made for this specific work. The General Term presumed it without any fact to found it upon. I think it was included in the original contract.
The objection to the excess over the estimate for the work done under the change of plan is not tenable. Such excess, I infer from the final estimate, was for work done under the change of plan, but not included in the estimate of the engineer' presented to the canal board. The canal board had assented to a change of plan, with an estimate of expense which turned out to' be something less than it cost, by reason of the omission of some items of work which the change made necessary. There is nothing in the statute or in the contract limiting the payment for such work to the precise amount estimated. If the prices for this work had been specified in the contract, but the quantities had exceeded the estimate, there could have been no question but that the contractor would have been entitled to pay for the whole amount actually done. It is very rare that an estimate of quantities is entirely accurate. No question is made but that the work was done by the relator in pursuance of the contract, and it has passed the supervision of the engineers and canal commissioner, and there is no valid reason why payment should not be made.
The order of the Special and General Terms should be reversed, and the motion for mandamus granted, with costs.